UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAMELLE ALLEN,

        Plaintiff,

vs.

        Case No. 05-CV-72886

        HON. GEORGE CARAM STEEH

PETERS TRUCKING, INC., et al,

        Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This matter comes before the court on a motion for summary judgment made by Defendants Peters Trucking, Inc., and Glenn A. Peters, against Plaintiff Kamelle Allen. On July 22, 2005, Plaintiff brought a suit against Defendants to recover noneconomic damages sustained as a result of a November 2003 accident in which all parties were involved. Defendants filed a motion for summary judgment on June 14, 2006, and Plaintiff filed a response on June 30, 2006. Oral arguments were heard before the court on July 26, 2006. Because plaintiff has put forth sufficient facts to allow the fact finder to conclude that the threshold necessary for maintaining a tort action has been met, the court DENIES Defendants' motion for summary judgment.

I. THE ACCIDENT

On November 18, 2003, Defendant Peters, a resident of Brockport, New York, was traveling eastbound in the right lane of Interstate 69 (I-69) near Emmett in Saint Clair County, Michigan, in a 1994 Freightliner truck owned by Defendant Peters Trucking, a company incorporated under the laws of the State of New York and with its primary place of business located in Leroy, New York. At approximately 12:10 p.m., Defendant Peters, running low on fuel, passed the junction of I-69 and Michigan Highway 19 (M-19), off of which was located a fuel stop for large trucks. The fuel stop was only accessible from I-69 by exiting at M-19. After recognizing that he had missed the M-19 exit, Defendant Peters decided instead to make a prohibited left turn via the center median and proceed westbound, retracing his path until he reached the M-19 exit approximately one-tenth of a mile to the west. At the same time, Plaintiff, a 34-year-old woman and resident of Imlay City, Michigan, was traveling eastbound in the left lane of I-69 in a 2003 Honda Civic, slightly behind Defendant Peters. When Defendant Peters executed his left turn from the right lane of eastbound I-69 he crossed the left lane of eastbound I-69 in front of Plaintiff, causing her 2003 Honda Civic to collide with his 1994 Freightliner. Plaintiff's vehicle was destroyed and Plaintiff was trapped inside. Defendant Peters escaped uninjured and in fact rescued Plaintiff from her vehicle.

Defendants assert that "[f]or purposes of this motion the facts of the accident and the issue of negligence [are] not at issue." (Br. Supp. Defs.' Mot. Summ. J. 3.) Plaintiff "assume[s] that the Defendants are not seriously arguing issues of liability." (Pl.'s Br. Supp. Answer Mot. Summ. J. 3.) Although Defendants have conceded "[i]n this case and for purposes of this motion... [that Plaintiff] sustained an objectively manifested

impairment of a body function...," (Br. Supp. Defs.' Mot. Summ. J. 5), the pertinent question for purposes of this motion for summary judgment remains whether this objectively manifested impairment of a body function has impeded Plaintiff's general ability to lead a normal life. A history of Plaintiff's medical treatment and recovery progress is helpful.

## II. PLAINTIFF'S MEDICAL TREATMENT AND RECOVERY PROGRESS

Plaintiff was taken by ambulance from the scene of the accident to the Saint John River District Hospital (Saint John) Emergency Room in East China, Michigan, where, coincidentally, she was employed as a registered nurse. Triage notes taken by Plaintiff's attending nurse state that Plaintiff "complained of pain [from her] left shoulder, left clavicle, left sternal area where seat belt crosses, also states [she] hit [her] left shoulder on left door... also complained of pain [from her] left hip where [it] hit [the] car door...." Plaintiff was discharged from the Emergency Room with a provisional diagnosis of "acute motor vehicle accident, cervical strain acute chest wall contusion."

On November 21, 2003, Plaintiff commenced follow-up treatment with her primary physician, Dr. Bridgette Stern, M.D., of Cornerstone Health Services in Washington, Michigan. Dr. Stern diagnosed contusions of the abdomen and chest wall as well as whiplash, and recommended physical therapy. Plaintiff underwent physical therapy at Saint John between December 29, 2003, and February 10, 2004. Defendants quote Plaintiff's physical therapist for their allegation that Plaintiff was "'progressing nicely in physical therapy'", to the point that she "was returned" to work as of February 6, 2004, with restrictions that she could work only four-hour shifts and that she could not lift over 20 pounds. (Br. Supp. Defs.' Mot. Summ. J. 3-4.) On February 19, 2004,

Defendants continue, the restrictions on Plaintiff's shift lengths and lifting capacity were loosened, and by May she was able to work alternating four- and eight-hour shifts. (Id.) Defendants claim that Plaintiff informed her physical therapist that she "felt that she had no problems when she was at work. (Id.) Plaintiff alleges that her injuries did not in fact respond to Dr. Stern's treatment supplemented with a regimen of physical therapy. (Pl.'s Br. Supp. Answer Mot. Summ. J. 2.) Moreover, in sworn deposition testimony she denies having returned to work between November 2003 and October 2005. (Id. at 6.) Indeed, Plaintiff alleges, on March 1, 2004, her employer, Saint John, gave notice that "we cannot accommodate the weight restrictions placed on [Plaintiff] in her duties as a registered nurse..." and terminated her position. (Id.)

In addition, on January 6, 2004, two months after the accident, Plaintiff consulted Dr. Kesterke, a psychologist with Saint John's Eastwood Clinic in St. Clair, Michigan, to work through the major depressive disorder and posttraumatic stress syndrome she had developed as a consequence of her inability to return to work as a registered nurse at Saint John. (Id. at 4.) Plaintiff claims that she had "enjoyed nursing and developed a social system of support at the hospital and experienced great personal satisfaction in her professional contribution of caring for others." (Id.) Dr. Kesterke diagnosed Plaintiff with major depressive disorder and posttraumatic stress syndrome and prescribed her 5 milligrams of Lexapro. (Id.) Plaintiff continues to be treated by Dr. Kesterke to this date. (Id.) Indeed, on July 7, 2006, Dr. Kesterke prepared a medical narrative for Plaintiff in which she states that Plaintiff continues to "carr[y] a diagnosis of Major Depressive Disorder and Posttraumatic Stress Disorder... She engages in regular (weekly)

4

individual therapy with me and medical reviews by our psychiatrist to regulate her medication." In particular, Dr. Kesterke noted that:

> [Plaintiff] continues to deal with the negative impact that the auto accident caused her personally, professionally, and financially. These stressors continue to be the focus of our treatment. It is hoped that the treatment goals can be achieved, i.e., to maintain a stable mood, decease depressive symptoms, develop healthy cognitive patterns, decrease overall level of anxiety, reduce the negative impact that the accident has had on client's life and to return to pretrauma level of functioning.

(Pl.'s Br. Supp. Answer Mot. Summ. J. Ex. 13 at 1-2.) However, on April 21, 2006, Dr. Jarrett Schroeder, M.D., of the Evaluation Group in Southfield, Michigan, conducted an independent psychiatric evaluation of Plaintiff at Defendants' request and found no evidence to support any claim for psychiatric condition or disability at that time. (Br. Supp. Defs.' Mot. Summ. J. 5.)

Plaintiff and Defendants are in agreement that Plaintiff next consulted with Dr. Thomas Perkins, D.O., of the Michigan Knee and Shoulder Institute of Auburn Hills, Michigan. Plaintiff's first visit with Dr. Perkins occurred on April 20, 2004, and Dr. Perkins recommended that Plaintiff "will remain off work w/restricted duty until" the results of an MRI evaluation of her left shoulder, chest, and lumbar spine could be analyzed. However, Plaintiff claims that "Dr. Perkins was unable to pinpoint the exact cause of [Plaintiff's] ongoing problems...." (Id. at 4.) Yet, he did indicate both on May 18, 2004, and on August 24, 2004, that Plaintiff was not to lift "greater than five pounds [with her] left arm, no pushing, pulling, no reaching, bending." (Id. at 8.) Defendants, however, allege that Dr. Perkins noted that Plaintiff was gardening and "doing some things around the house..." and that generally he found she was "improving." (Br. Supp. Defs.' Mot. Summ. J. 4.)

Plaintiff then asked Dr. Stern for a referral to Dr. Andrew Haig, M.D., an Associate Professor at the Interdepartmental Spine Program of the University of Michigan Hospital in Ann Arbor, Michigan. (Pl.'s Br. Supp. Answer Mot. Summ. J. 3.) Dr. Haig first observed Plaintiff on December 9, 2004, when he performed an MRI of Plaintiff's ribs and was able to make a diagnosis of costochronditis, sternal clavicular joint problem, and mild sublaxation. (Id.) Dr. Haig noted that:

> This can be a very stubborn and painful problem and also takes a long time to go away. It is not surprising that she is continuing to have difficulties... I think she is doing a good job of working to cope with this problem but the [sic] she can use a multidisciplinary approach to her pain... I would ask that Dr. Kesterke help her come up with wise choices balancing her future versus her realistic aspect of her pain and her physical abilities, also deal with issues such as biofeedback or self-hypnosis and deal with any residual posttraumatic stress disorder or depression that continue. She also has practical problems in basic aspects of daily living. She will do well to visit with an occupational therapist. I have asked her to make a list of 40 to 50 areas in which she has troubles before she visits the therapist to make efficient use of the therapists [sic] time. I am not optimistic about physical therapy doing a lot with this problem but a very expert manual physical therapist might make a difference with her ribs, especially the posterior component of her pain. Even though it is a long distance, it is best for her to see one of our therapists so I can be sure that she has got the best possible approach."

(Id.) Defendants, however, draw attention to Dr. Haig's observation that Plaintiff was "'getting by pretty well physically.'" (Br. Supp. Defs.' Mot. Summ. J. 4.) Plaintiff subsequently enrolled in a physical therapy program at the University of Michigan Spine Program at Dr. Haig's suggestion. (Pl.'s Br. Supp. Answer Mot. Summ. J. 3.) She completed the program in April 2005 and on April 28, 2005, Dr. Haig observed continued tenderness on Plaintiff's left side over her pectoralis muscle and full range without pain in her left shoulder. (Id.) He suggested that she continue with the physical therapy at the University of Michigan Spine Program and recommended that she

commence occupational therapy. (Id.) He also recommended that she continue her treatment with Dr. Kesterke. (Id. at 4.) Plaintiff followed Dr. Haig's recommendations, including participating in occupational therapy at the University of Michigan because she could not locate an adequate occupational therapist in her community (Id. at 3-4.) Defendants allege that Dr. Haig cleared Plaintiff to return to work without restrictions as of June 2, 2005. (Br. Supp. Defs.' Mot. Summ. J. 4.)

Dr. Haig also referred Plaintiff to Dr. Ned Kirsch, Clinical Associate Professor and Program Director at the Rehabilitation/Neuropsychology Department of the University of Michigan Hospital in Ann Arbor, Michigan, for neuropsychological testing. (Pl.'s Br. Supp. Answer Mot. Summ. J. 4) Dr. Kirsch suggested that Plaintiff gradually transition back to full work under the supervision of an occupational work evaluator. (Id.)

In October 2005 Plaintiff returned to part-time employment for one month, following the instructions of Drs. Haig and Kirsch, and limiting herself to four to eight hours per week administering influenza vaccinations on behalf of the Visiting Nurses Association of Michigan (VNA). (Id.) In deposition testimony taken on November 22, 2005, Plaintiff reported that, after working a four hour shift at the VNA, she needed three days to recover to the point where she felt capable of returning for another shift because the "[m]uscular pain was phenomenal. I am left handed[; the] injury is on the left side. You are standing three to four hours and you are bending down, standing up, bending down, you are giving shots to people in their arm[. I]t's the muscle[;] it's bad." (Id. at 7-8.) In January 2006 Plaintiff resumed full-time employment as an agency nurse with J.D. Modrich Staffing, through which she is stationed at the Ferguson Convalescent Home in Avoca, Michigan. (Id. at 4.) She is paid $30.00 an hour, which is more than the $27.10

hourly rate that she earned at Saint John; however, at her previous position she enjoyed benefits, which she does not enjoy at her current position. (Id.) Plaintiff suggests that working at a convalescent home is not as "satisfying" as working at a hospital, and wishes to eventually return to Saint John when she fully recovers. (Id. at 5.) To this date she "continues to have residual problems with her left shoulder and left lower back, with pain exacerbated by exertion." (Id.)

### III. THE SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See, e.g., Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice; the procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Ky. Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distribs. Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986); Redding, 241 F.3d at 532.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48; see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the moving party establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-moving party's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-moving party.  McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

IV. THE PROVISIONS OF MICHIGAN'S NO FAULT ACT AND THE MICHIGAN SUPREME COURT STANDARD FOR THIRD-PARTY MOTOR VEHICLE TORT RECOVERY

Section 500.3135(1) of the Michigan Compiled Laws provides that "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." Id. Plaintiff claims she has suffered "serious impairment of body function". Section 500.3135(7) of the Michigan Complied Laws defines "serious impairment of body function" as "[a]n

objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." Id.

In a recent landmark case, Kreiner v. Fischer, 683 N.W.2d 611 (Mich. 2004), the Michigan Supreme Court "provide[d] the lower courts with a basic framework for separating out those plaintiffs [who allege a serious impairment of body function] who meet the statutory threshold [for third-party tort recovery] from those who do not." Id. In sum, the Michigan Supreme Court laid out a three step process. First, the nature and extent of Plaintiff's injuries must be determined as a question of fact. Id. at 625. Second, the court must decide whether Plaintiff has suffered an objectively manifested impairment of an important body function as a question of law. Id. Finally, the court must determine whether Plaintiff's serious impairment of body function has affected her general ability to lead his or her normal life. Id. at 625-26.

## V. ANALYSIS

Defendants have conceded "[i]n this case and for purpose of this motion... [that Plaintiff] sustained an objectively manifested impairment of a body function." (Br. Supp. Defs.' Mot. Summ. J. 5.) It is therefore the court's responsibility to determine as a matter of law whether Plaintiff's objectively manifested impairment of a body function has affected her general ability to lead her normal life. Kreiner, 683 N.W.2d at 625-26. If the court finds that an objectively manifested impairment of a body function has affected Plaintiff's general ability to lead her normal life, then Plaintiff will be found to have met the requirement of section 500.3135 of the Michigan Compiled Laws that she has sustained a serious impairment of body function, and Defendants will be subject to tort liability for Plaintiff's noneconomic loss caused by their ownership, maintenance, or use

of a motor vehicle in connection with the parties' November 18, 2003, accident. If the court finds that an objectively manifested impairment of body function has not affected Plaintiff's general ability to lead her normal life, then Plaintiff will not have met the requirements of section 500.3135 of the Michigan Compiled Laws, and Defendants will not be subject to tort liability. The court may only perform this function if it is satisfied "that there is no factual dispute concerning the nature and extent of [Plantiff's] injuries; or, if there is a factual dispute, that it is not material to the determination of whether [Plaintiff] has suffered a serious impairment of body function." Kreiner, 683 N.W.2d at 625. Indeed, "if a court determines there are factual disputes concerning the nature and extent of[ P]laintiff's injuries that are material to determining whether[ P]laintiff has suffered a serious impairment of body function, the court may not decide the issue as a matter of law." Id.

The Michigan Supreme Court has given extensive consideration to constructing a framework by which lower courts might evaluate an injured person's objectively manifested impairment of an important body function and determine if that impairment has affected the injured person's general ability to lead his or her normal life. In particular, the Michigan Supreme Court reasoned that:

> In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the court must engage in an objective analysis regarding whether any difference between the plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely "*any* effect" on the plaintiff's life is insufficient because a de minimus effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life.

11

> The following nonexhaustive list of objective factors may be of assistance in evaluating whether the plaintiff's "general ability" to conduct the course of his normal life has been affected: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. This list of factors is not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves. For example, that the duration of the impairment is short does not necessarily preclude a finding of a "serious impairment of body function." On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a "serious impairment of body function." Instead, in order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the course of his or her normal life."

Kreiner, 683 N.W.2d at 626 (footnotes omitted).

In support of their motion, Defendants draw the court's attention to the Michigan Supreme Court's further ruminations on the mechanics of determining an injured person's general ability to lead a normal life. Specifically, Defendants note the Michigan Supreme Court's conclusions that "determining whether a plaintiff is 'generally able' to lead his normal life requires considering whether the plaintiff is, 'for the most part' able to lead his normal life...," and that, "[a]lthough some aspects of a plaintiff's entire normal life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the plaintiff's normal life has not been affected, then the plaintiff's 'general ability' to lead his normal life has not been affected...." Kreiner, 683 N.W.2d at 624-25. Defendants introduce the factual pattern of the Kreiner case as well as three recent, unpublished Michigan Court of Appeals cases, to illustrate these principles at work. In Kreiner, the Michigan Supreme Court held that even though the plaintiff was apparently permanently unable to work to full capacity, "his impairment did not affect his overall

12

ability to conduct the course of his normal life... A negative effect on a particular aspect of an injured person's life is not sufficient in itself to meet the tort threshold...." Id. at 628. Defendants also draw the court's attention to Jacobs v. Provost, No. 246238, 2004 Mich. App. LEXIS 2776 (Mich. Ct. App. Oct. 21, 2004), in which it was reiterated that a "negative effect on a particular aspect of an injured person's life such as their work is not sufficient in itself to meet the tort threshold, as long as the injured person is still generally able to lead his normal life...," id. at *5, Banwell v. Burstein, No. 251128, 2005 Mich. App. LEXIS 925 (Mich. Ct. App. Apr. 14, 2005), in which it was held that restrictions on an injured person's general ability to lead a normal life that are self-imposed do not establish a general inability to lead a normal life, id. at *7, and Keelean v. Mack, No.262174, 2005 Mich. App. LEXIS 2034 (Mich. Ct. App. Aug. 18, 2005), in which it was held that when an injured party "continues to be able to do almost everything he once could, although with more difficulty[, and where the injured party] has lost some mobility and a degree of self-sufficiency, but his lifestyle has not appreciably changed...," the tort threshold has not been met, id. at *7. Defendants argue that, in light of these cases from the Michigan Supreme Court and the Michigan Court of Appeals, Plaintiff does not meet the third-part automobile tort threshold because she:

> continued with her general life activities. Work was restricted for a period of time, but the only limitation was heavy lifting and virtually nothing else. Otherwise, plaintiff could cook, drive, clean, take care of herself and continue with social and personal relationships. Aside from minimal work restrictions, plaintiffs [sic] restrictions are otherwise self-imposed, and since she continues to be able to do almost everything she once could, although with more difficulty, her lifestyle has not appreciably changed and, therefore, plaintiff is unable to establish a serious impairment of body function.

(Br. Supp. Defs.' Mot. Summ. J. 14.)

Plaintiff counters that the facts of this case are distinguishable from those that Defendants cite above because none of them "involve an automobile related injury that prohibited the injured party from working for over two years, from lifting nothing heavier than five pounds, or suffering the continuous effect of post-traumatic stress syndrome." (Pl.'s Br. Supp. Answer Mot. Summ. J. 14.) Plaintiff argues that when her injuries are considered in light of the nonexhaustive list of objective factors announced in Kreiner, it is clear her general ability to lead a normal life has been affected. Specifically, regarding the nature and extent of her impairment, Plaintiff draws the court's attention to Dr. Haig's diagnosis of "a very stubborn and painful problem [that] takes a long time to go away...," and his remark that "[i]t is not surprising that she is continuing to have difficulties." (Id. at 9.) Plaintiff notes that the type and length of her treatment have been severe, including approximately two years of treatment for her physical maladies and psychological treatment for her posttraumatic stress syndrome that continues to this date. (Id.) Plaintiff notes that the duration of her impairment was such that she was unable to return to full-time work for two years and two months, from November 2003 to January 2006, and that during that period her only part-time work occurred during October 2005 and was severely restricted by her doctor. (Id.) Finally, Plaintiff notes that her residual impairment consists of her continuing treatment for major depressive disorder and posttraumatic stress syndrome. (Id.) Even now, she claims, she is unable to return to her preferred work setting in a hospital, as opposed to a convalescent care facility. (Id. at 5.) Plaintiff concludes that, although:

> Defendant[s] argue[ ]that "Plaintiff continued on with her general life activities" after the date of the accident[,] Plaintiff's "general life activities" prior to the accident included full time employment as a registered nurse.

14

> Plaintiff did not suffer from major depression related to a primary diagnosis of post traumatic stress syndrome. Her daily activities did not include doctor office visits, extensive medical testing, or repeated courses of physical therapy. Further, the on-going psychological treatment was not one of her "general life activities".

(Pl.'s Br. Supp. Answer Mot. Summ. J. 10.)

The court must view the facts in the light most favorable to Plaintiff, the non-moving party. Matsushita Elec. Indus. Co., 475 U.S. at 587. In that light, the several medical reports and histories prepared by Plaintiff's various doctors and independent examiners support materially different factual conclusions as to the effects her objectively manifested impairment of an important body function might have rendered on her ability to generally lead her normal life. The facts surrounding Plaintiff's return to work and her diagnosis of major depressive disorder and posttraumatic stress syndrome are ambivalent to say the least. On the one hand, Plaintiff's sworn deposition testimony is that she did not return to work until October 2005, and Defendants have produced no tax records or income statements indicating otherwise. Moreover, Dr. Kesterke's evaluation of Plaintiff's mental state as recently as July 7, 2006, is powerfully persuasive of a serious psychological trauma suffered by Plaintiff as a result of the November 18, 2003, accident, especially her recitation of Plaintiff's symptoms, including:

> [D]epressed mood, affect disturbance, decreased energy, decreased interest in activities previously enjoyed, social withdrawal, inability to concentrate, difficulty organizing her thoughts, frequent ruminations about the accident, intrusive thoughts/images about the accident, decreased self-care, weight gain, increased anxiety/nervousness, fear of dying[,] excessive worry related to finances, employment loss and health issues[,] feelings of hopelessness, a fatalistic attutude regarding the future and relational problems...,

all of which are reported to have developed only following the accident. (Pl.'s Br. Supp. Answer Mot. Summ. J. Ex. 13 at 1.) On the other hand, Dr. Stern's records dating from February 2004 do appear to indicate that Plaintiff returned to work, or at least that she was medically cleared to do so, and Dr. Schroeder's independent evaluation of Plaintiff's mental state in April 2006 is authoritative in its own right, and indicative, at the least, of professional disagreement as to the proper diagnosis of Plaintiff's contemporary psychological ailments. A reasonable person might find either of these conclusions to be appropriate, and these opposing conclusions as to the nature and extent of Plaintiff's injuries necessarily control the answer to the question of whether Plaintiff suffered a serious impairment of body function. The record also reflects additional and significant factual disputes among Plaintiff's treating physicians as to the nature of her injury and the course of her treatment. To draw attention to merely one example, Dr. Stern appears to have indicated in February 2004 that Plaintiff could lift no more than twenty pounds, whereas six months later in August 2004, Dr. Perkins appears to have indicated that Plaintiff could lift no more than five pounds. Whether this disagreement is the result of a degenerative condition, a misdiagnosis by Dr. Stern, or an overly cautious analysis by Dr. Perkins, remains beyond the purview of the court.

CONCLUSION

Ultimately the court must conclude that summary judgment is inappropriate in this case. Under the Kreiner standard, "if a court determines there are factual disputes concerning the nature and extent of[ P]laintiff's injuries that are material to determining whether[ P]laintiff has suffered a serious impairment of body function, the court may not decide the issue as a matter of law." 683 N.W.2d at 625. Here, a reasonable person

16

might well disagree as to the conclusions regarding the nature and extent of Plaintiff's injuries to be drawn from the record the parties have prepared for this motion. This factual dispute is material to the determination of whether Plaintiff suffered a serious impairment of body function as a matter of law. Further factual development is necessary to flesh out the ambivalent medical narratives, and to evaluate the credibility of competing medical diagnoses. The Michigan Supreme Court is clear that, under these circumstances, such a matter properly belongs before a jury. Id.

For the reasons set forth above, Defendants' motion for summary judgment is hereby DENIED.

IT IS SO ORDERED.

                                    s/George Caram Steeh
                                    GEORGE CARAM STEEH
                                    UNITED STATES DISTRICT JUDGE

Dated: August 16, 2006

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on August 16, 2006, by electronic and/or ordinary mail.

                                    s/Josephine Chaffee
                                    Secretary/Deputy Clerk